**Grady GLYMPH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 84–509.

District of Columbia Court of Appeals.
Argued March 25, 1985.
Decided April 22, 1985.

Thomas R. Kennedy, Washington, D.C., appointed by this court, for appellant.

R. Jeffrey Behm, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Ava J. Abramowitz, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN, TERRY, and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of simple assault,[1] a lesser included offense of assault with a dangerous weapon,[2] for which he was indicted.[3] On appeal he contends that the trial court erred in instructing the jury on simple assault as a lesser included offense, over his objection, and that the prosecutor engaged in misconduct during the voir dire of the jury and in her closing argument. We disagree with both contentions and affirm the conviction.

**I**

Gloria Simmons had been appellant's girl friend for fourteen years. One evening in December 1982, as she was about to enter her home after returning from work, appellant drove past and honked his horn. She walked over and got into appellant's car at his invitation. Almost immediately, however, he asked her why she had entered the car, "because he had told [her] two days previous to that that he wasn't going to bother with [her] any more." Simmons responded by opening the door and starting to get out, but appellant reached across in front of her, pulled the door shut, and drove off.

As they rode along, Miss Simmons asked appellant to leave her alone and told him that she wanted to go home because she "didn't want to start any trouble with him." Nevertheless, when they arrived at appellant's apartment building a few blocks away, Miss Simmons accompanied appellant upstairs to his apartment because she was frightened of what he might do if she tried to leave. Once they were inside the apartment, appellant locked the door with a key and put the key in his pocket.

Appellant then sat down and told Miss Simmons that she was "going to give him some answers." He accused her of disturbing some of his kitchen utensils and leaving them in the wrong places, then said that she had put some "things" under his bed and that "he knew what it meant." Simmons testified:

> He said that his children and everybody were involved in it, he knew about it, it was in the Bible, and that—but he wanted some answers from me about exactly what it was that I was doing to him, what I was trying to do, and what about a sacred oath that I had taken, he knew I had taken a sacred oath ....

---

1. D.C.Code § 22–504 (1981).

2. D.C.Code § 22–502 (1981). The weapon alleged in the indictment was a baseball bat.

3. The indictment also charged appellant with kidnapping, but this count was dismissed during trial for reasons unrelated to the present appeal.

When she denied his accusations, appellant demanded that she sign her name on a piece of paper. She wrote her signature on the paper, but appellant claimed that it was not her usual way of writing her name. Then he hit her, grabbed her by both arms, and pushed her into a wall. When she screamed, he told her to shut up and shoved her into the bathroom. He held her against the wall with his hand around her neck, again ordered her to shut up, and said that he was "going to get some answers." Then he picked up a washcloth and stuffed it in her mouth.

After a few moments appellant removed the washcloth, and the two of them went back into the living room. Appellant continued to ask Miss Simmons about the "sacred oath" and accused her of playing "mind games." When she started crying again, he told her to shut up and then made a short telephone call to his niece. After he hung up, the phone rang. As appellant was talking to the caller, Simmons began "yelling for him to stop ... and asking him to leave [her] alone." He put the washcloth back into her mouth and threw her again to the floor. When she got up, he pushed her into a closet in the bedroom. Then he "got a bat from somewhere" and once again demanded "some answers," holding the bat in his right hand and pointing it at her. As he spoke, appellant was standing about eight to ten feet from Miss Simmons, who by then had emerged from the closet. When she started screaming, however, he put the bat down. The action then moved back into the living room. Simmons' testimony continued:

> I don't have it in sequence, but ... I remember being in the living room by the couch, on the floor, and he grabbed my wrist and told me to shut up, and I think he hit me with something, because I told him my back hurt, and I screamed.

Appellant took her into the bedroom and laid her on the bed. The next thing she remembered was seeing police officers in the apartment.

Miss Simmons was taken by ambulance to Georgetown University Hospital, where she was treated and released. The treating physician testified that Miss Simmons had a lump in the back of her head, some swelling on the left side of her face near her eye, multiple scratches on her back,[4] muscle spasms, and bruises and swelling on her right arm and thigh. From the nature and location of these injuries the doctor concluded that she had been beaten (rather than, for example, hit by a car).

Appellant did not testify. The only defense witness was a man who said that appellant, whom he had known for twenty-five years, always kept his baseball bat out in the open in his apartment. Appellant's theory of defense was essentially that Miss Simmons had conjured up her story of the assault in retaliation for appellant's bad treatment of her over the years. Defense counsel told the court, "Hell hath no fury like a woman scorned, and that is the gist of our defense."

## II

■ The trial court, over appellant's objection, instructed the jury on simple assault as a lesser included offense of assault with a dangerous weapon. The court concluded that it had no choice, citing our decision in *Pendergrast v. United States*, 332 A.2d 919 (D.C.1975). We said in *Pendergrast:*

> The determination of whether a lesser included offense instruction is *required* turns upon the answers to two questions. First, is the relationship between the greater offense and the lesser offense such that a lesser offense instruction would be proper; that is, does the lesser offense consist entirely of some but not all of the elements of the greater offense? ... Second, does the evidence justify giving the charge; that is, is

---

4. Simmons had testified that on one occasion when she was knocked to the floor, she landed on her back on a rubber mat with "spokes" in it which scratched her back.

there a sufficient evidentiary predicate to support the charge?

*Id.* at 924 (emphasis added; citations omitted). Appellant evidently believes that *Pendergrast* stands for the proposition that a court may not give a lesser included offense instruction over a defense objection. He is in error. The test is not whether there is an objection from either party, but whether the evidence supports the giving of the instruction. We made this clear several years ago in *Lightfoot v. United States,* 378 A.2d 670 (D.C.1977), in which the jury was instructed on the greater offense of armed robbery and the lesser included offense of robbery:

> The threshold question is whether appellant had the right to have withheld from the jury the lesser-included offense of robbery .... *Resolution of that question turns on whether the evidence was such that the jury could rationally find appellant guilty of the lesser offense but innocent of the greater; i.e., was there a disputed factual element.*
>
> \* \* \* \* \* \*
>
> ... [A] judge should not submit to the jury a lesser included offense over the objection of either the prosecution or the defense *where the requisite disputed factual element is lacking.*

*Id.* at 672–673 (emphasis added). Thus it does not matter whether appellant objected or not, for an objection cannot turn a correct instruction into an erroneous one. The question which we must decide here is the usual one in cases such as this, namely, whether there was evidence before the jury that would rationally support a finding that appellant committed the lesser offense but not the greater.

■ In this case the answer to that question is clearly yes. The factual element which divides assault with a dangerous weapon from simple assault is the use of a weapon. *See, e.g., Williamson v. United States,* 445 A.2d 975, 978 (D.C.1982).

There was copious evidence of an assault in Gloria Simmons' testimony, corroborated by the testimony of the doctor who treated her at the hospital. The evidence relating to the weapon, however, was meager at best. Miss Simmons testified that appellant had a baseball bat in his hand when the two of them were standing in the bedroom, but that he put the bat down when she screamed. The only evidence that appellant might have hit her with the bat was her statement, "I think he hit me with something." This, however, came after appellant had put the bat down, and the two combatants had moved from the bedroom to the living room. When questioned about the bat on cross-examination, Simmons said, "I saw him holding the bat. When my back was hurt, I don't know what I was hit with." The doctor testified that Simmons had said "she had been beaten with some hard object, but she didn't know exactly what the object was." On this record there was clearly a rational basis for finding that appellant assaulted Miss Simmons with his hands, but not with a baseball bat.

■ Appellant contends that we must view the baseball bat episode in isolation from the rest of the events that occurred in the apartment. His theory seems to be that because he never swung the bat at Miss Simmons, never threatened her with it, and was never close enough to hit her with it when he had it in his hand, he could not have committed an assault of any kind while holding the bat. He argues that the series of beatings and other abuses must be considered separately, as discrete assaults which were not charged in the indictment and for which he could not have been convicted. We cannot agree. The entire sequence of events lasted little more than an hour.[5] The evidence established not a succession of detached incidents but a continuing course of assaultive conduct. Here, as in *Jones v. United States,* 483 A.2d 1149, 1152 (D.C.1984), "there was no

---

5. Miss Simmons first saw appellant in front of her house at approximately 6:45 p.m. The crime scene search officer (who is usually not the first to respond to the scene of a crime) arrived at appellant's apartment at 8:10 p.m.

break in the continuity of events ...." Thus we hold that all of the beatings, kickings, and shovings were encompassed within the single charge of assault with a dangerous weapon, even though some of the individual blows may have been struck by appellant's bare hand.

Indeed, it would probably have been error to subdivide the succession of beatings into separate counts, since on these facts appellant could not have been convicted and sentenced separately for each assaultive incident. "The fact that a criminal episode of assault involves several blows or wounds, and different methods of administration, does not convert it into a case of multiple crimes for purposes of sentencing." *Smith v. United States*, 135 U.S. App.D.C. 284, 285, 418 F.2d 1120, 1121, *cert. denied*, 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969). By the same reasoning, the incident with the baseball bat cannot be separated from the rest of the evening's events for the purpose of deciding whether a lesser included offense instruction should have been given. We conclude, therefore, that the instruction was proper.

### III

During voir dire, the prosecutor put the following questions to the prospective jurors:

Ms. ABRAMOWITZ: This case also involves a fight between a boy friend and girl friend, between people who had known each other for fourteen years. Is there any among you who believes that physical violence is an expected or accepted part of a relationship between two people who know each other and are boy friend and girl friend?

(No response)

Ms. ABRAMOWITZ: Is there any among you who feels that that relationship should give the people in that relationship a special kind of immunity so that if they assault each other, they don't have to stand trial in court?

(No response)

Ms. ABRAMOWITZ: If the Government proves each and every element of the kidnapping and the assault with a dangerous weapon beyond a reasonable doubt, is there any of you who could not find the Defendant guilty simply because he had a relationship with the complainant for fourteen years and they basically still talk to each other today?

(No response)

Later, during closing argument, the prosecutor reminded the jurors of those voir dire questions:

Let's go way back to Friday. Do you remember Friday, when you were selected to serve on this jury, you were all seated out there and I asked you three questions. I asked you, one, did any of you think that in a boy-friend-girl-friend relationship, or a husband-wife relationship, a certain level of physical violence was expected, anticipated and acceptable. Do you remember that? Not one of you said yes.

Then I asked you a second question, did any of you think that a boy-friend-girl-friend relationship gave a kind of immunity, so that if the boy friend assaulted the girl friend, he didn't have to stand up here in court.

MR. DEBERARDINIS [defense counsel]: Objection.

Ms. ABRAMOWITZ: Not one of you said yes.

THE COURT: No. That's permissible. You may proceed.

Ms. ABRAMOWITZ: Thank you.

Then I asked you a third question. I asked you whether any of you would not be able to convict the Defendant if the Government proved up each and every element of assault with a deadly weapon—dangerous weapon beyond a reasonable doubt, simply because they were boy friend and girl friend, had been together for fourteen years and might still be together today. Not one of you said yes.

Appellant contends that both the voir dire questions and the later reference to them

in closing argument constituted misconduct. There is no merit whatever in this contention.

"[T]he very purpose of the *voir dire* is to permit counsel to satisfy themselves that they have an impartial jury." *Harvin v. United States,* 297 A.2d 774, 777–778 (D.C. 1972) (footnote omitted); *see Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984). That end is accomplished by allowing counsel "a full and fair opportunity to expose bias or prejudice on the part of the veniremen." *United States v. Robinson,* 154 U.S.App.D.C. 265, 269–270, 475 F.2d 376, 380–381 (1973), citing *Morford v. United States,* 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950). In this case the prosecutor did not stray from the purpose of the voir dire. Her questions were specifically designed to uncover any bias or prejudice in any of the prospective jurors, an entirely legitimate goal. For this reason the prosecutor's questioning did not amount to misconduct. *Cf. State v. Edwards,* 650 S.W.2d 655, 660 (Mo.Ct.App.1983) (prosecutor did not commit misconduct in a rape case by asking prospective jurors during voir dire "whether a woman who accepts a ride in an automobile with someone she does not know is thereby extending an invitation to the driver of the vehicle to rape her"; the question was held relevant to juror bias). Appellant's reliance on ABA STANDARDS FOR CRIMINAL JUSTICE § 3–5.3(c) (2d ed. 1980) is misplaced, since the prosecutor did not argue her case during voir dire or place inadmissible facts before the jury.

It necessarily follows that there was no misconduct in the prosecutor's closing argument, for she merely called the jury's attention to the voir dire questions which we have held were entirely proper. "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case." *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Here the prosecutor was simply reminding the jurors to set aside any bias or prejudice

that they might have. Again the ABA STANDARDS, *supra,* § 3–5.8(c) and (d), are not relevant because the prosecutor's remarks were not inflammatory and were not designed to divert the jury from its duty to decide the case solely on the evidence. We find no impropriety in her argument.

*Affirmed.*