**Marcus K. WINSTEAD, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 98–CF–348, 01–CO–1497.

District of Columbia Court of Appeals.

Submitted Oct. 8, 2002.

Decided Oct. 31, 2002.

---

William T. Morrison filed a brief for appellant in No. 98–CF–348. Henry A. Escoto filed a brief for appellant in No. 01–CO–1497.

Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, Tina Sciocchetti, and Tricia D. Francis, Assistant United States Attorneys, were on the brief for appellee in No. 98–CF–348. Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, David P. Saybolt, and Denise M. Clark, Assistant United States Attorneys, were on the brief for appellee in No. 01–CO–1497.

Before FARRELL and GLICKMAN, Associate Judges, and NEWMAN, Senior Judge.

GLICKMAN, Associate J.

A jury found Marcus K. Winstead guilty of fourteen felonies, including three counts of first degree sexual abuse while armed, kidnapping while armed, and armed carjacking. The trial judge imposed a sentence totaling sixty years to life in prison, and subsequently denied without a hearing Winstead's motion to vacate his convictions on grounds of ineffective assistance of counsel. We affirm. Winstead raises several issues on appeal, but in our view the only one that merits more than summary treatment concerns the proper construction of the carjacking statute that the Council enacted in 1993, D.C.Code § 22–2803 (2001).[1]

## I.

According to the government's proof at trial, Winstead committed his crimes while on a weekend pass from a youth home. Shortly after he left on the pass, Winstead stole a Buick Skylark parked near his

---

1. At the time of Winstead's trial, the offense of carjacking was codified at D.C.Code § 22– 2903 (1996).

mother's residence. At around six o'clock the following morning, he drove the stolen car to the vicinity of the WTTG Fox Television station in Northwest Washington, D.C. Abandoning the car on the street behind the station, Winstead walked to the guard booth in the WTTG parking lot. Alone in the booth was E.J., a young woman working for the station as an unarmed security guard. Pointing a gun at E.J., Winstead ordered her out of the booth, reached into her purse, and removed her car keys. Winstead led E.J. to her car, a Geo which was parked in the WTTG lot a few feet away from the guard booth, and directed her to drive him across town to an alley in Northeast Washington. There Winstead ordered E.J. to stop and to take off all her clothes. Winstead then forced E.J. to engage in sexual acts with him, holding his gun to the base of her neck and threatening to beat her when she resisted and tried to leave the car.

Despite the danger and Winstead's threats, E.J. made another attempt to get out of the vehicle. Winstead pulled her back and reached for his gun, but it fell to the floor and E.J. grabbed it first. Unable to fire the weapon, E.J. exited the car with it and ran naked out of the alley while Winstead, disarmed, drove off. The residents of a nearby house took E.J. in, clothed and sheltered her, and called the police. The gun that E.J. seized from Winstead was loaded and operable.

The next morning, E.J.'s Geo was located in an alley in Southeast Washington. The car had been set on fire and was still burning. The evidence recovered from the vehicle included E.J.'s clothing and purse and a condom that Winstead had used during the assault. The stolen Buick Skylark was found the following week, parked on the street behind WTTG. The driver's door window was smashed and the steering column was damaged. A bag by the front passenger seat contained a screwdriver.

The government adduced compelling evidence, which we need not recount in detail, that Winstead was the perpetrator of these crimes. Among other things, Winstead matched the detailed description of her assailant that E.J. gave the police, down to a distinctive skin graft on his left thigh. E.J. identified Winstead from his photograph two days after her ordeal and in person at trial. The police recovered E.J.'s college book bag and compact disk player at the youth home to which Winstead had returned after his weekend pass. A resident of the youth home testified that Winstead brought the compact disc player with him when he returned and sold it to the witness for thirty dollars. Following his arrest, Winstead made a confession in which he admitted using a screwdriver to steal a car similar in appearance to the Buick Skylark, abandoning it within walking distance of WTTG, and then abducting a woman from a booth in the WTTG parking lot at gunpoint. Winstead denied sexually assaulting his captive and claimed that he released her on Pennsylvania Avenue (far from Northeast Washington, where the police had found E.J.), but admitted driving off in her car and later setting fire to the vehicle.

Winstead presented no evidence in his defense.

## II.

■ Winstead's main challenge in his direct appeal is to his carjacking conviction. The offense of carjacking is committed if a person knowingly or recklessly uses force or violence to "take from another person *immediate actual possession* of a person's motor vehicle." D.C.Code § 22–2803(a)(1) (emphasis added). Winstead contends that the term "immediate actual possession" means that the victim

must be in direct physical control of the car at the time of the initial assault, "in a position to put a key into the ignition and ... start the engine." From that premise, Winstead argues that the evidence did not support his conviction for carjacking because E.J. was in the guard booth rather than in her car when he initially assaulted her.[2]

■ ■ The flaw in Winstead's argument lies in its premise. The Council borrowed the term "immediate actual possession" from the robbery statute on which the carjacking statute is patterned.[3] As used in the robbery statute, the term "refers to the area within which the victim can reasonably be expected to exercise some physical control over the property." *Head v. United States*, 451 A.2d 615, 624 (D.C. 1982). "[A] thing is within one's 'immediate actual possession' so long as it is within such range that he could, if not deterred by violence or fear, retain actual physical control over it." *Rouse v. United States*, 402 A.2d 1218, 1220 (D.C.1979). *See generally Leak v. United States*, 757 A.2d 739, 743 (D.C.2000) (noting that immediate actual possession "may continue for purposes of robbery even though the owner is prevented by force from effectively exercising that possession"). By employing the same term in the closely related carjacking statute, the Council evidently intended that it be given the same scope; there is no reason to think otherwise. We therefore reject Winstead's contention that under the carjacking statute, the victim must be in the car or in direct physical control of the car at the time of the assault. Rather, we hold, in agreement with the D.C. Circuit, that under the carjacking statute, immediate actual possession "is retained if the car is within such range that the victim could, if not deterred by violence or fear, retain actual physical control over it." *United States v. Gilliam*, 334 U.S.App. D.C. 391, 402–03, 167 F.3d 628, 639–40 (1999) (affirming convictions of carjackers who confronted their victim and took his car after he stepped out of the vehicle to unlock a parking lot gate).[4]

■ ■ Nor, contrary to the premise of Winstead's argument, does the question of "immediate actual possession" necessarily turn on whether the victim is within close enough range of the car at the precise time the assault commences. The carjacking

---

**2.** Winstead also argues that the trial judge erred in failing to instruct the jury that "immediate actual possession" means that the victim is in a position to operate the vehicle when the assault commences.

**3.** *Compare* D.C.Code § 22–2801 (2001) ("Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery.") *with* D.C.Code § 22–2803(a)(1) ("A person commits the offense of carjacking if, by any means, that person knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, or attempts to do so, shall take from another person immediate actual possession of a person's motor vehicle."). The Report of

the Committee on the Judiciary referred to the new offense as "robbery of a motor vehicle." COUNCIL OF THE DISTRICT OF COLUMBIA, COMM. ON JUDICIARY, Report on Bill 10–16, the "Carjacking Prevention Amendment Act of 1993," at 2 (February 10, 1993). We have recognized the "obvious similarity" of the offenses despite the slight differences in their elements. *Pixley v. United States*, 692 A.2d 438, 440 (D.C.1997).

**4.** In accord with our holding, the trial judge in this case properly instructed the jury that "[a] motor vehicle is in the immediate actual possession of the complainant if it is located close enough that one could reasonably expect the complainant to exercise physical control over it." The language is verbatim from Instruction No. 4.51, "Carjacking," in the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4TH ED.1993).

statute contains no such temporal limitation. A carjacker may take immediate actual possession of a motor vehicle from another by force or violence at any point during a continuous course of assaultive conduct, not just at the starting point.

It follows from our rejection of Winstead's premise that the evidence in this case was sufficient to prove carjacking in violation of D.C.Code § 22–2803. When Winstead assaulted E.J. at the guard booth, her car was only a few feet away, near enough for it to be in E.J.'s "immediate actual possession" then and there. Winstead removed any doubt, however, when he ordered E.J. to get into the car with him. Winstead then took immediate actual possession of the car from E.J. by force when he held his gun on her and ordered her to drive against her will. While E.J. remained at the wheel, it was Winstead who directed her movements and usurped actual physical control of the vehicle. It was no less a carjacking because Winstead took his victim along with the car.

### III.

■ Moving on to Winstead's other claims, we are unpersuaded by his argument that there was insufficient evidence to link him to the stolen Buick Skylark. The night before Winstead kidnapped E.J., the Buick's owner had parked the car in front of the apartment building in which Winstead was staying on his pass. The owner discovered the following afternoon that the vehicle was missing. Not long afterward, the car was located on a street near the WTTG lot. Its steering column had been broken, and a screwdriver that could have been used to start the engine was found inside. In his confession, Winstead admitted that he used a screwdriver to steal a car and drive it to the vicinity of the WTTG television station the morning of the kidnapping. Although Winstead described the car he took as black while the stolen Buick was dark blue on its side and tan on the front, a reasonable jury readily could have discounted this discrepancy in light of the other evidence and concluded beyond a reasonable doubt that it was indeed the Buick that Winstead stole.

■ Finally, we agree with the trial judge that no evidentiary hearing was required on Winstead's post-conviction claims that his trial attorney was constitutionally ineffective in failing to move to suppress his confession and to introduce DNA evidence. As to the confession, Winstead failed to proffer sufficient facts to show that his *Miranda* rights waiver was invalid or that his ensuing statement was involuntary.[5] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see, e.g., Artis v. United States,* 802 A.2d 959, 966 (D.C.2002) (upholding denial of ineffectiveness claim without a hearing, where movant's allegations did not show that a motion to suppress evidence likely would have been granted if one had been filed). In addition, the record, which included an unrebutted affidavit from Winstead's trial counsel, showed that the DNA evidence would not have given rise to a reasonable probability of acquittal and that counsel made a reasonable tactical decision

5. Winstead alleged only that he was "groggy" during his questioning and that the interrogating officer made "false promises and allegations." In support of the latter allegation, Winstead relied solely on the fact that during his taped interrogation (which was played at trial) the officer falsely told him that his fingerprints were on the condom recovered from E.J.'s car. But this misstatement was immaterial because it came at the end of the interrogation and E.J. said nothing in response to it. In his appeal brief, Winstead alleges for the first time that the officer also falsely promised him that he would be charged as a juvenile rather than as an adult. As Winstead did not make this allegation to the trial judge, we do not consider it. *See Young v. United States,* 639 A.2d 92, 97 n. 8 (D.C.1994).

not to introduce it.[6] *See Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (to prevail on an ineffectiveness claim, the movant must show performance of counsel falling "below an objective standard of reasonableness" and a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

## IV.

In sum, none of Winstead's claims of error entitles him to relief. We affirm Winstead's convictions and the judgment on appeal.

*So ordered.*

6. Prior to trial Winstead's counsel received a DNA analysis of a spot of semen found on E.J.'s underpants, which the police had recovered from her burning car. According to the analysis, the semen was not contributed by Winstead. Trial counsel explained in an affidavit why she did not use this DNA evidence at trial. The prosecutor had informed her that if the evidence was introduced, E.J. would testify that she was naked and not wearing the underpants when Winstead sexually assaulted her, and that she had had intercourse with someone else a day or two before the assault. The government also would present evidence that semen does not wash out of clothing easily. Trial counsel discussed the DNA evidence with Winstead in light of these considerations, and he agreed with her that using it at trial would undermine the credibility of the defense case.