**Kenneth T. BEANER and Keith A. Baham, Appellants,**

v.

**UNITED STATES, Appellee.**

**No. 99–CF–1668, 01–CF–139.**

District of Columbia Court of Appeals.

Argued April 15, 2003.
Decided March 25, 2004.

Frederick G. Seelman, Jr., appointed by the court, Washington, for appellant Beaner.

M. Elizabeth Kent, appointed by the court, for appellant Baham.

Thomas S. Rees, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Angela G. Schmidt, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and REID, Associate Judges, and KING, Senior Judge.

TERRY, Associate Judge:

Appellants Beaner and Baham were jointly tried and convicted of armed carjacking, armed robbery, aggravated assault while armed ("AAWA"), assault with

a dangerous weapon ("ADW"), possession of a firearm while committing a crime of violence, and carrying a pistol without a license. On appeal they attack their convictions on several grounds. We agree that appellant Baham should have received a five-year sentence enhancement, rather than a ten-year enhancement, for his AAWA and armed robbery convictions. We also agree that both appellants' ADW convictions merge with their convictions of armed robbery. The sentences of both appellants must therefore be modified as set forth in part V of this opinion, and for that limited purpose we remand. In all other respects, we affirm.

## I. FACTS

### A. The offenses

At around 8:30 p.m. on February 25, 1999, Antonio Brown was driving his mother's black Mazda automobile on Georgia Avenue when he received an urgent page. He quickly found a pay phone near Ninth and Upshur Streets, N.W. When he got out of the car to make a phone call in response to the page, he left the car idling "about three feet up from the pay phone," keeping an eye on it as he placed the call. After waiting on hold for approximately five to ten minutes, Brown noticed two men wearing ski masks walking toward him. The shorter man with a darker complexion stopped behind Brown and grabbed hold of him. He told his companion, described by Brown as taller with a lighter complexion, to check Brown for a gun. The taller man lifted up his own shirt, pulled out a gun, and held it against Brown's stomach while frisking him for a weapon. The shorter man then struck Brown on the back of the head with what Brown believed to be the gun he saw in his

peripheral vision, and also threatened to kill him. Both men then dragged Brown to some nearby bushes, took his money out of his pocket, and robbed him of his Air Jordan shoes,[1] his pager, an identification card, a bank card, and a supermarket courtesy card. Seconds later Brown heard one of the assailants say, "That's the car right there." He then heard the car seats being pushed back, and a moment later the assailants "skidded off" in the Mazda. Brown testified that he had been struck in the head a total of three times, which caused him to suffer "bleeding in the brain," a loss of consciousness, and scarring. His injuries required stitches, multiple CAT scans, and a short stay in the hospital.

Once the gunmen left, Brown crossed the street to a fast-food restaurant and asked an employee there to call the police. Officer Kyra Williams of the Metropolitan Police responded and took a report from Brown, in which he described the assailants as two black men—one dark-skinned and the other light-skinned—wearing black masks and hooded sweatshirts (or jackets with hoods) and blue jeans, and carrying handguns; one of them also wore Timberland boots. In addition, Brown told the officer that the light-skinned robber had a black nine-millimeter pistol, while the dark-skinned robber had a chrome or silver .45 caliber pistol, and that they stole between $150 and $230 in cash along with his Air Jordan shoes. Officer Williams then broadcast a "flash lookout" for the robbers which included the Mazda's license number.

### B. Events immediately preceding and following the robbery

Angela Bonney was Beaner's girl friend at the time of the robbery; she and Bean-

---

1. Brown described the shoes as white with black trim, with the words "North Carolina 23" embossed on the back. He also said that

they were size 8 and that he had removed the insoles.

er lived together, and Baham was a frequent visitor in their home. On the date of the robbery, Baham came to Bonney and Beaner's apartment at around 4:30 p.m. with his seven-year-old daughter Yolani. After about thirty to forty-five minutes, Beaner, Baham, and Yolani left together.[2]

Ms. Bonney testified that Baham and Beaner returned to her apartment about two hours after they had left. She described them at that time as "fidgety and moving around." Bonney heard Beaner say, "I know you're mad at me for what I did, for the way I hit him," to which Baham replied, "No, man, I love you." Ms. Bonney then saw Beaner take off a pair of black boots and change into a pair of Air Jordan shoes. Baham in turn pulled a bag from behind the couch and took out of it a "gray jumper," into which he changed from the black leather jacket that he had been wearing. The two men also had with them a driver's license bearing the name of Antonio Brown, a car registration card, a gun, a pager, and some money, which Beaner and Baham began to divide. Bonney recalled that they were "rushing to get out of the house." Once they had changed clothes, Beaner said, "We've got to hurry up because we don't want them to notice the car." Upon leaving, the two men took an "Italian print scarf" belonging to Ms. Bonney to keep the gun covered, but left everything else behind except the money they had divided up.

On February 26, the day after the robbery, Ms. Bonney found a pager in the jacket that Baham had left in her apartment. When it went off, Bonney called the displayed number, thinking it might be the number of Baham's wife, but instead she reached a woman who asked for "Tony." Ms. Bonney then discarded the jacket and the pager. Latel Tucker, Antonio Brown's former girl friend, testified that when she tried to page Brown on February 26, a woman named "Angie" responded, but hung up when she denied knowing anyone named "Tony."

### C. The search for the robbers

At 9:08 p.m. on February 25, Officer Christopher Myhand received a broadcast lookout about a carjacking. The lookout reported that the car was a black Mazda MX–6 with license number AB–2884, occupied by two men with handguns. Within minutes of the broadcast, Officer Myhand, traveling eastbound on Florida Avenue, N.W., spotted in his rear view mirror a car matching this description as it attempted to make an illegal U-turn. Keeping an eye on the car, Officer Myhand asked the dispatcher to repeat the license number, and when the dispatcher complied, the officer saw that it matched the tags on the Mazda. Officer Myhand quickly made a U-turn and started to follow the Mazda. When the two occupants of the Mazda realized that a police car was pursuing them, they stopped the car, jumped out, and ran into an alley. The officer, although he was moving fast, lost sight of the two men as he came within thirty to fifty feet of the Mazda.

About ten to fifteen seconds later, as he drove past an alley that ran southbound from Florida Avenue in the middle of the 1200 block, Officer Myhand caught sight of "the same two individuals" running side by side down the alley. He activated his car's emergency lights and sped down 13th Street, which was parallel to the alley in which the men were running. He then turned into a connecting alley and saw the

---

**2.** According to the later testimony of Baham's wife, her husband came to her office shortly after 7:30 p.m. to drop off their daughter. He stayed there until about 8:10 p.m. and then left alone.

two suspects, still running side by side. As he closed the gap from behind, he saw that one of the men was wearing a dark jacket and blue jeans and that the other was dressed in "all gray." Officer Myhand also saw a "dark cloth object" fall to the ground between the two men, who were still running side by side.

The two men ran across 12th Place and into another alley, then turned north into a third alley heading back toward Florida Avenue. Upon reaching the spot where the men turned, Officer Myhand got out of his car and began to pursue them on foot. Peering around the corner of a building, he saw the man clad in gray trying to remove the upper part of his garment as he ran, but he lost sight of the other man. The officer broadcast a lookout, stating that one of the suspects—the man in gray—had turned east upon reaching Florida Avenue. Within seconds, Myhand heard a broadcast stating that the man had been apprehended on Florida Avenue. When he arrived at Florida, Officer Myhand saw appellant Baham "in the custody of other officers standing next to a police car" and recognized him as the man he had been chasing because he had "a gray jump suit down around his ankles."[3]

With Baham now in custody, Officer Myhand broadcast a lookout for the other suspect. Almost immediately thereafter, appellant Beaner emerged from the back yard of a house adjacent to the alley. Myhand recognized Beaner, on the basis of his clothing, as the other man he had been chasing and ordered him to the ground. He also noticed that Beaner was wearing Air Jordan shoes.[4] Unprompted by any questioning, Beaner declared that he just "came out of his bitch's house." The entire chase lasted approximately one minute.

Once both suspects were apprehended, Officer Myhand went back to the place where he saw the "dark cloth object" fall and learned from another officer on the scene that it was a black knit ski mask. He also requested that K–9 officers sweep the alley. No one else was found, however, and Officer Myhand did not recall seeing anyone in the alley area during the chase. Myhand also spoke with Shawn Davis, from whose back yard Beaner had emerged. Mr. Davis told Officer Myhand that he had been at home with his family that evening, that he had no visitors, that the back door was bolted and never used, and that he knew no one by the name of Kenneth Beaner. He also explained that, because his home was a row house, the back door was the only way to get directly from the house into the back yard.

Officer Martin Fosso, a crime scene search technician, arrived at the scene and spoke to officers who had found a "stocking mask" in the "east side alley off of 12th Place," as well as "another ski mask" just over a fence in a nearby yard at 1221 W Street, N.W. From the black Mazda, Offi-

---

3. Officer Darren White had heard Officer Myhand's broadcast while patrolling in the 1100 block of Florida Avenue, and soon thereafter he saw Baham standing on the corner of Florida Avenue and 12th Street with a gray jump suit around his ankles. Officer White advised Baham at gunpoint that he was a police officer and ordered him to lie on the ground.

4. Officer Myhand did not yet realize the significance of the shoes. It was not until he spoke with Mr. Brown later at the hospital that he learned that Brown's shoes had been stolen. Officer Myhand then went to Beaner's detention cell to recover the shoes. He testified that they were size 8 and had "blue 23 markings on the back" and no insoles. At trial, the shoe box in which they came was introduced into evidence, along with the insoles. Latel Tucker, Brown's former girl friend, testified that she had purchased the shoes for him as a gift.

cer Fosso recovered an operable nine-millimeter Ruger pistol, as well as a "silk-looking scarf" that Ms. Bonney identified at trial as hers.

### D. *Defense evidence*

Beaner testified in his own behalf, stating that Ms. Bonney had given him the Air Jordan shoes as a gift. He also said that he met Baham as he was walking to a restaurant and that, on the way there, he bought some marijuana from a stranger. As they entered the alley, Beaner said, he saw "two dudes hauling ass out of there." He admitted that he started to run when he saw the police cruiser, but said that he ran because he had marijuana on his person and entered someone's back yard to hide it.

Baham did not testify. His defense consisted mainly of trying, through the testimony of his wife, Charlotte Baham, to discredit Angela Bonney on the basis of her previous untruthfulness before the grand jury and her alleged bias against Beaner. A defense investigator also testified about a conversation he had with Ms. Bonney in which she said she was sorry that Baham "was in the middle of this."

## II. ISSUE RAISED BY BOTH APPELLANTS: IMMEDIATE ACTUAL POSSESSION

■ "A person commits ... carjacking if, by any means, that person ... shall take from another person immediate actual possession of a person's motor vehicle." D.C.Code § 22–2903(a)(1) (1996).[5] Beaner filed a pre-trial motion to dismiss the armed carjacking count (in which Baham joined at the hearing on the motion), arguing that Brown was not in "immediate

actual possession" of the Mazda. Citing *Mobley v. State*, 111 Md.App. 446, 681 A.2d 1186 (1996), the trial court denied the motion.[6] Appellants again moved for judgment of acquittal after the government's case, but those motions were also denied. Before this court, appellants argue that Brown did not have immediate actual possession of the Mazda because he was not "inside the car or just getting in or out." Appellants emphasize that Brown was talking on the telephone several feet from the car, with his back turned, and that the car doors were closed.

An argument very similar to the one appellants make here was rejected by the court in *United States v. Gilliam*, 334 U.S.App. D.C. 391, 167 F.3d 628 (1999). In *Gilliam* several masked men, in order to procure a getaway car for a bank robbery, confronted a bank manager with a gun as he opened the bank's parking lot gate to park his car. The car was "nearby with the driver's door open and the engine running." *Id.* at 395, 167 F.3d at 632. After robbing the bank, the masked robbers fled in the manager's car. On appeal they argued that there was insufficient evidence of carjacking under D.C.Code § 22–2903 because the bank manager was several feet away from his car at the time he was assaulted. The court rejected this argument, ruling that immediate actual possession, "an element borrowed from the crime of robbery ... is retained if the car is within such range that the victim could, if not deterred by violence or fear, retain actual physical control over it." *Id.* at 402–403, 167 F.3d at 639–640 (citations omitted). Because the bank manager left the car with the engine running and the driver's door open, "[t]he jury could rea-

---

**5.** Recodified as D.C.Code § 22–2803(a)(1) (2001).

**6.** There is no legal basis for a "motion to dismiss" in such circumstances. Rather, the motion should have been, and was, treated as a motion for judgment of acquittal.

sonably find that the bank manager *intended to get back into his car* ... but the robbers prevented him from doing so, and thus deprived the manager of immediate [actual] possession of his car." *Id.* at 403, 167 F.3d at 640 (emphasis added).

We recently adopted the *Gilliam* holding in *Winstead v. United States,* 809 A.2d 607 (D.C.2002). In that case the defendant ordered a security guard at gunpoint to leave her booth, grabbed her keys out of her purse, led her to her car in a parking lot a few feet away, and directed her to drive him across town. On appeal, the carjacking conviction was challenged on the ground that the victim was not in immediate actual possession of the car because she was not in it when the assault was initiated. We held that the legislature "borrowed the term 'immediate actual possession' from the robbery statute on which the carjacking statute is patterned." *Id.* at 610 (footnote omitted). Thus, for purposes of carjacking, immediate actual possession "refers to the area within which the victim can reasonably be expected to exercise some physical control over the property." ... "[A] thing is within one's 'immediate actual possession' so long as it is within such range that he could, if not deterred by violence or fear, retain actual physical control over it." *Id.* (citations omitted);[7] *see also Mobley v. State,* 111 Md.App. 446, 455, 681 A.2d 1186, 1190 (1996) (interpreting "actual possession" in Maryland's carjacking statute to mean that "the victim need only be entering, alighting from, or otherwise in the immediate vicinity of the vehicle"); *Price v. State,* 111 Md.App. 487, 500, 681 A.2d 1206, 1212 (1996) (citing *Mobley*).

The *Gilliam* and *Winstead* cases are dispositive of appellants' argument. Brown left his car running only a few feet away when he stopped to make an urgent phone call, keeping an eye on it as he placed the call. Thus it was certainly reasonable for the jury to conclude that he intended to get back into the car when he completed the phone call, and would have done so had he not been assaulted. Appellants emphasize that this case is different from *Gilliam* because here the car doors were closed, whereas in *Gilliam* the doors were left open. Such factual hairsplitting is of no legal significance, since immediate actual possession is determined not by whether the doors were open or closed, but by whether the victim remained in the vicinity of the car and evinced an intention to return to the car. *See Winstead,* 809 A.2d at 610–611. Furthermore, appellants argue that the taking of the Mazda was an "afterthought" and a "purely tangential part of the armed robbery, or a separate—but uncharged—theft." This argument is also unpersuasive, for we made clear in *Winstead* that "[a] carjacker may take immediate actual possession ... at any point during a continuous course of assaultive conduct, not just at the starting point." *Id.* at 611.

Appellants' reliance on language from the legislative history of the carjacking statute does not dissuade us from our holding. To support their argument that a victim must be getting into or alighting from a car, appellants cite the following excerpt from a legislative committee report:

> For the victim, carjacking is an especially traumatic experience. First, most feel

---

7. Thus, for purposes of the carjacking statute, we adopted the same definition of "immediate actual possession" on which we relied in *Leak v. United States,* 757 A.2d 739, 743 (D.C. 2000), a case involving the robbery of a bicycle that was lying on the ground two feet away from its owner. *See also Spencer v. United States,* 73 App. D.C. 98, 116 F.2d 801 (1940) (wallet in the pocket of trousers lying on a nearby chair was within immediate actual possession of its owner, who was in bed with a prostitute a few feet away).

that being inside of their car offers some protection from the outside world. Carjacking invades their zone of privacy in a way that perhaps is similar only to burglary.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 10–16, at 2 (1993). In *Winstead* we discerned the meaning of "immediate actual possession" solely by examining the statutory language. *See* 809 A.2d at 610 ("By employing the same term in the closely related carjacking statute, the Council evidently intended that it be given the same scope; there is no reason to think otherwise."). By delving into the legislative history before establishing that the statutory language is ambiguous, appellants violate a fundamental principle of statutory interpretation. "In interpreting a statute, we first look to the plain meaning of its language, and if it is clear and unambiguous and will not produce an absurd result, we will look no further." *In re D.H.*, 666 A.2d 462, 469 (D.C.1995) (citations omitted).

We therefore hold that there was ample evidence to prove that the car was within the immediate actual possession of Mr. Brown at the time appellants took it and drove it away.

### III. ISSUES RAISED BY BEANER

#### A. *Motions to suppress evidence*

■ Beaner filed pre-trial motions to suppress both the statement he made to Officer Myhand that he had just come from his girl friend's house [8] and physical evidence—namely, the Air Jordan shoes he was wearing when he was arrested—on the ground that there was no probable cause for his arrest. The thrust of Beaner's argument is that Officer Myhand lost sight of the suspects several times as they fled down the alley, and that he was not able to describe them with particularity (other than by their race and gender) when they initially fled from the Mazda. Therefore, Beaner contends, when Officer Myhand again saw two men running in the alley, it was unreasonable for him to conclude that they were the same persons who alighted from the Mazda.

After a lengthy hearing, the trial court denied Beaner's motions. The court found that even though Officer Myhand lost sight of the two men who ran from the Mazda, there were no other people in the area, and only a brief amount of time had elapsed before two men were again seen running in close proximity to the Mazda. At this point, the court ruled, there was a sufficient basis for a *Terry* stop.[9] Officer Myhand then learned from the occupant of the home from whose back yard Beaner had emerged that he had had no visitors that night and that the back door was not in use. Additionally, the officer found out moments later that the cloth object which he saw fall along the chase route was a ski mask. Given these facts, the court was

---

8. The court denied the motion to suppress the statement on the ground that, although Beaner was in custody, the statement was a spontaneous declaration. Beaner states in his brief that both motions should have been granted, but he makes no argument to support suppression of his statement. We therefore regard it as abandoned. *See Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (argument deemed abandoned when "[a]ppellants provide no supporting argument in their brief for this general assertion"). Even if not abandoned, it would fail, since there is no evidence in the record that the statement was anything other than spontaneous or that it was made in response to any custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Jones v. United States*, 779 A.2d 277, 284 (D.C.2001) (en banc).

9. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

satisfied that the detention had lawfully ripened into an arrest based on probable cause.

■■■ When reviewing a trial court's denial of a suppression motion, we review its findings of fact for clear error and its conclusions of law *de novo*. *E.g., United States v. White*, 689 A.2d 535, 537 (D.C. 1997). "[T]he test for judging the existence of probable cause is whether a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience, would be warranted in the belief that an offense has been or is being committed." *Peterkin v. United States*, 281 A.2d 567, 568 (D.C. 1971) (citations and internal quotation marks omitted); *see also, e.g., Irby v. United States*, 342 A.2d 33, 37 (D.C.1975) ("probable cause exists when a police officer has a reasonable belief that a crime has been committed and the person or persons being arrested committed it" (citation omitted)).

Beaner contends that there was no probable cause to arrest him because the broadcast lookout was insufficient, in that it contained no description of the assailants, and because Officer Myhand did not "get a good enough look at the car occupants" as they fled.[10] We hold, to the contrary, that the officer had probable cause to arrest Beaner at the moment he emerged from Mr. Davis' back yard. Beaner misses the mark by focusing on the broadcast description (or lack thereof) of the assailants rather than the description of the stolen car. When Officer Myhand saw the Mazda in his rear view mirror, he had already received the broadcast description of the stolen car, including its

license number. Before deciding to investigate further, Officer Myhand asked for and received confirmation of that number. When he realized that it matched the number on the Mazda he saw on Florida Avenue, it was entirely reasonable for him to conclude that this was the very Mazda that had been reported stolen. Moreover, because Officer Myhand caught sight of the Mazda less than thirty minutes after it was stolen, it was reasonable for him to believe that its occupants were the thieves. *See Irby*, 342 A.2d at 37; *Coleman v. United States*, 137 U.S.App. D.C. 48, 53, 420 F.2d 616, 621 (1969); *Ralph v. Pepersack*, 335 F.2d 128, 132–133 (4th Cir.1964). The reasonableness of this belief was enhanced when the occupants took headlong flight when they surmised that the officer was coming after them. *See Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). We hold that Officer Myhand was fully justified in concluding that the occupants of the Mazda were the ones who had committed the carjacking, and that this justification amounted to probable cause.

Contrary to Beaner's argument, probable cause existed even though Officer Myhand briefly lost sight of the suspects during his pursuit of them. They were out of his line of sight for only a few seconds, and there were no other people in the area. Thus the odds that two other similarly dressed men entered the alley together within such a short time span—let alone two men running side by side at a full sprint—were extremely slim. When he saw the two fleeing individuals again, Officer Myhand was able to get an even better look at Beaner's clothing, which allowed

---

10. Even though Beaner was ordered to the ground at gunpoint and immediately handcuffed when he emerged from the back yard, the trial court found that he was not yet under arrest but was, instead, detained pursuant to

a *Terry* stop. We need not decide whether this ruling was correct because we are satisfied that even if the detention was really an arrest, it was based on probable cause.

him to recognize Beaner when he emerged from Mr. Davis' back yard. We hold accordingly that Officer Myhand was warranted in the belief that Beaner had fled from the stolen Mazda, *see Hill v. United States*, 627 A.2d 975, 977 (D.C.1993) (probable cause finding upheld when a man fitting a broadcast description was spotted even though "five or ten minutes" had elapsed), especially given the unlikely explanation Beaner offered for being in Mr. Davis' yard, *see Williams v. United States*, 304 A.2d 287, 289 (D.C.1973) (an "inherently incredible explanation" may be taken into account in probable cause determination).

### B. *Motion to compel discovery*

In his pre-trial "Motion for Resolution of Discovery Issues," Beaner argued that the government should be compelled to disclose "the precise location where the ski mask was recovered," so that he could "highlight for the jury ... the distance the mask was found away from where he was arrested." The trial court denied this motion, holding that the government had "satisfied its discovery obligations" under Super. Ct.Crim. R. 16. Beaner argues on appeal that the court should have "weighed the interests of both parties" to determine whether disclosure of the exact location of the mask "would be justified on the grounds of fundamental fairness or to aid in administrative efficiency." [11]

Rule 16(a)(1)(C) requires the government, upon request, to allow the defense to inspect any documents or tangible objects that are "material to the preparation of the ... defense." *See Wiggins v.*

*United States*, 521 A.2d 1146, 1147–1148 (D.C.1987). Whether evidence is "material" requires a "prospective evaluation, from the point of view of the defendant prior to trial, of whether the evidence has potential value for the defendant's development of a defense." *Id.* at 1148 (citation omitted). Additionally, "the request for the evidence must be reasonable, that is, it may not unduly burden the government." *Id.* (citation omitted).

Before trial, the government disclosed to Beaner's counsel the exact location where one of the masks was recovered by providing a copy of the crime scene technician's report. As for the other mask, the government informed counsel that it was found in "a nearby yard," but did not give an exact address. On these facts, we hold that the court did not abuse its discretion in ruling that the government had satisfied its discovery obligations. Given the limited area where the pursuit occurred, this information certainly furnished defense counsel with an adequate starting point from which he could search for potential witnesses. Even if the government could perhaps have provided the exact address of the "nearby yard," its failure to do so was not prejudicial. As the government points out, Officer Fosso provided detailed information about the location of the masks at trial when he testified on a Friday, but Beaner did not rest until the following Wednesday. Thus his counsel had five days, including a weekend, to locate any potential witnesses related to the ski mask. We are satisfied that the trial court acted well within its discretion in denying Beaner's motion.

---

11. The government maintains that Beaner did not raise this point below. Although an alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was the main claim that Beaner advanced in his motion—a claim that he does not pursue on appeal—when read generously, the motion can be viewed as also containing the Rule 16-based argument that he now urges upon us. Beaner is not asking us to rule contrary to any position he took in the trial court; rather, he is arguing a point made below by trial counsel (who is not counsel on appeal) with less-than-perfect clarity.

### C. *Sufficiency of the evidence*

█ At the close of the government's case, Beaner moved for a judgment of acquittal, but the court denied the motion. Beaner now argues that the trial court erred because the government "failed to show beyond a reasonable doubt that the persons arrested were the same persons who committed the crime." He bases his argument on the fact that Antonio Brown, the only eyewitness to the crime, could not provide a particularized description of his assailants because they wore ski masks.

█ Viewing the evidence as we must in the light most favorable to the government, *see Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citing cases), we conclude that the evidence of guilt in this case was very strong. Although the assailants masked their faces, Mr. Brown was able to determine their relative heights and complexions, and at trial both appellants stood side by side in the well of the court so that the jury could compare their heights. Officer Myhand apprehended Beaner after he fled from a Mazda bearing the license number of the Mazda reported stolen only a few minutes earlier, and wearing the very shoes identified as those stolen from Brown's feet. Ms. Bonney, notwithstanding some credibility issues (which were explored in full before the jury), testified that Beaner and Baham brought into her apartment several personal items belonging to Brown—including personal identification and a pager—and

proceeded to divide up a quantity of money. In addition, she saw Beaner change out of black Timberland boots—identified by Brown as those worn by one of his assailants—upon returning to her apartment, and into the distinctive Air Jordan shoes which had been taken off Brown's feet. Viewed in its entirety, this evidence was more than sufficient to prove that Beaner was guilty of the crimes charged.

## IV. ISSUES RAISED BY BAHAM

### A. *The AAWA conviction*

Baham makes three arguments concerning his AAWA conviction: (1) that there was insufficient evidence that Mr. Brown suffered "serious bodily injury;" (2) that the trial court committed plain error by failing to define "serious bodily injury" in its jury instructions; and (3) that the court erred by not instructing the jury on simple assault as a lesser included offense of AAWA. For the following reasons, we reject all of these arguments.[12]

### 1. *Sufficiency of the evidence*

█ When moving for a judgment of acquittal at the close of the government's case, Baham's counsel argued with respect to the AAWA count that the government had failed to prove "serious bodily injury," an essential element of AAWA. The court denied the motion. Baham renews that contention on appeal.

---

12. In his initial brief, Baham also argues that his conviction of carrying a pistol without a license (CPWL) must be reversed because it violated the Second Amendment to the Constitution. This contention was soundly put to rest many years ago by this court in *Sandidge v. United States,* 520 A.2d 1057, 1058 (D.C.), *cert. denied,* 484 U.S. 868, 108 S.Ct. 193, 98 L.Ed.2d 145 (1987). In his reply brief, Baham clarifies his argument as follows: because it is allegedly the Attorney General's current position that the District of Colum-

bia's CPWL statute violates the Second Amendment, this issue will one day be addressed either by this court en banc or by the Supreme Court. Therefore, citing *United States v. Perkins,* 333 U.S.App. D.C. 167, 173–175, 161 F.3d 66, 72–74 (1998), for the "supervening decision doctrine," he states that he is "merely attempting to preserve the Second Amendment issue on direct appeal," should the issue be revisited. In these circumstances no further discussion of the matter is warranted.

"Serious bodily injury" is not defined in the aggravated assault statute, D.C.Code § 22–504.1 (1996),[13] but the definition found in the sexual abuse statute has been applied to aggravated assault. *See Nixon v. United States*, 730 A.2d 145, 150 (D.C.), *cert. denied*, 528 U.S. 899, 120 S.Ct. 233, 145 L.Ed.2d 196 (1999). The sexual abuse statute says:

> "Serious bodily injury" means bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

D.C.Code § 22–4101(7) (1996).[14] Baham argues that Brown suffered no serious bodily injury, since he spent only two days in the hospital[15] and his CAT scans were all negative. In making this argument, Baham relies chiefly on *Nixon*, in which we held there was insufficient evidence of serious bodily injury even though the victims suffered gunshot wounds. Because being shot is more serious than being hit on the head, reasons Baham, the trial court should not have denied his motion.

Baham's reliance on *Nixon* is misplaced because in *Nixon* we did not express any opinion as to the seriousness of the gunshot wounds suffered. Rather, we reversed the AAWA conviction in *Nixon* because neither victim testified, and there was no medical testimony or documentation to establish that the gunshot wounds fit the definition of serious bodily injury.

*See Nixon*, 730 A.2d at 151. Consequently, the jury was left to speculate about whether the victims' injuries were "serious bodily injuries" within the meaning of the aggravated assault statute.

■■■ In the present case, however, there was testimony by the victim that he lost consciousness from multiple blows to his head. Thus the situation here is more like that in *Gathy v. United States*, 754 A.2d 912 (D.C.2000), in which the victim, who was slashed across the face with a broken beer bottle, testified that he was "semi-unconscious," "in total shock," and "[not] totally coherent." In light of this testimony, we held that "a reasonable juror could reasonably conclude that there was a 'substantial risk of unconsciousness.'" *Id.* at 918. By analogy, a reasonable juror in the case at bar could conclude, from Brown's similar testimony, that there was not merely a substantial *risk* of unconsciousness, but an *actual* loss of consciousness, thus placing his injuries squarely within the statutory definition of serious bodily injury.[16]

## 2. *Failure to define serious bodily injury*

■■■ Baham further argues that the trial court committed reversible error by failing to define "serious bodily injury" in its instructions to the jury. "[T]rial courts must instruct juries on the definition of serious bodily injury in aggravated assault cases." *Riddick v. United States*, 806 A.2d

---

13. Recodified as D.C.Code § 22–404.01 (2001).

14. Recodified as D.C.Code § 22–3001(7) (2001).

15. Brown testified that he spent three or four days in the hospital, but his medical records indicate that he may have been there for only two days. For present purposes the exact duration of his hospital stay does not matter.

16. Characterizing Brown as a "liar" and his testimony as "malingering," Baham challenges the evidence by attacking Brown's credibility. The jury, however, was in the best position to judge Brown's credibility, and its decision to believe him must be given "full play." *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987).

631, 638 (D.C.2002) (citation omitted); *accord, Hudson v. United States,* 790 A.2d 531, 533 (D.C.2002); *Zeledon v. United States,* 770 A.2d 972, 976 (D.C.2001). Thus there can be no doubt that the court's failure to do so was error. Whether this error warrants reversal, however, depends in large part on the applicable standard of review. Because Baham's counsel did not object to the jury instructions, his present argument must be assessed under the plain error standard. *See Zeledon,* 770 A.2d at 974. Under that standard, as set forth in *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), Baham not only must establish "error," but also must show that the error was "plain" and that it "affect[ed] substantial rights." *See Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001) (citation omitted). Additionally, even if Baham "satisfies these three hurdles, he must then show either a 'miscarriage of justice,' that is, actual innocence; or that the trial court's error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (citations omitted).

▮ Although this issue has arisen in other cases, we have not yet decided whether such an error is "plain." Instead, in every case thus far we have based our decision on other parts of the *Olano* plain error standard. Thus, for example, in *Wilson* we held that the defendant's substantial rights were not affected because the trial court instructed the jury on each element of aggravated assault. *Wilson,* 785 A.2d at 327.[17] Furthermore, even if the trial court in *Wilson* had defined "serious bodily injury," we found it unreasonable, in light of the evidence, to conclude

that "a juror who voted to convict [the defendant] under the instruction given by the trial judge would have acquitted him of aggravated assault because of insufficient evidence of 'serious bodily injury.'" *Id.* at 328; *see also Riddick,* 806 A.2d at 639 ("we are not persuaded that his conviction amounted to a 'miscarriage of justice', or that the 'fairness and integrity' of judicial proceedings will be undermined ... in light of the trial court's complete enumeration of all the elements of the crime of aggravated assault ... and ample evidence of the seriousness of the assault" (citations omitted)).

The course we followed in *Wilson* and *Riddick* is appropriate here as well. The jury was instructed on each element of AAWA, and there is no reason to believe that the jury would have voted to acquit, given Brown's testimony that he lost consciousness. Thus Baham's substantial rights were not affected. In addition, in light of the overwhelming evidence against him which we have already summarized, Baham cannot establish the final element of plain error—that is, actual innocence or a miscarriage of justice.

### 3. *Lesser included offenses*

▮ The trial court agreed to instruct the jury on simple assault as a lesser included offense of ADW, but did not do so for AAWA. Baham argues that the court erred in failing to instruct the jury on both simple assault and ADW as lesser included offenses of AAWA. We hold that the trial court did not err.

▮ Simple assault is a lesser included offense of ADW. *Glymph v. United*

---

17. A "misdescription" or "omission" of an element of a crime "precludes the jury from making a finding on the *actual* element of the offense." *Neder v. United States,* 527 U.S. 1, 10, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (emphasis in original). However, "the omis-

sion of a definition of a term appearing in an element of the statutory crime is not equivalent to the omission of an essential element of the crime." *Wilson,* 785 A.2d at 327; *cf. Curington v. United States,* 621 A.2d 819, 823 (D.C.1993).

*States,* 490 A.2d 1157, 1158 (D.C.1985). The factual element which separates ADW from simple assault is the use of a weapon. *Id.* at 1160. ADW is, in turn, a lesser included offense of AAWA. *Gathy,* 754 A.2d at 919. However, before the court may instruct the jury on any lesser included offense, there must be "evidence before the jury that would rationally support a finding that appellant committed the lesser offense but not the greater." *Glymph,* 490 A.2d at 1160.

Because Baham struck Brown from behind, it is possible—regardless of Brown's belief that he was struck with the gun—that Baham used only his hands. *See id.* (because the victim did not see the object with which she was struck, "there was clearly a rational basis for finding that appellant assaulted [her] with his hands, but not with a baseball bat"). Thus, had Baham acted alone, a lesser included offense instruction on simple assault might have been warranted. But because Baham was, at a minimum, an aider and abettor of Beaner, whom Brown clearly saw standing in front of him with a pistol pointed at his stomach, there could have been no rational basis for the jury to find that a weapon was not used in the assault, regardless of whether Brown was ever struck. Accordingly, no lesser included offense instruction was warranted for AAWA. Indeed, the trial court was overly generous in instructing the jury on simple assault as a lesser included offense of ADW, but if that was error, it benefited Baham, so he cannot complain about it now.

## V. SENTENCE ENHANCEMENT AND MERGER

Baham argues, and the government concedes, that the ten-year mandatory minimum sentence enhancement for armed robbery and AAWA should be vacated and remanded with instructions to enter a five-year mandatory minimum sentence on each of those counts. Baham's enhancement was based on a previous conviction for being an accessory after the fact to assault with intent to commit robbery. Being such an accessory, however, is not listed as a "crime of violence" or "dangerous crime" in the statute which defines those terms and authorizes sentence enhancements based upon them, D.C.Code § 22–3201 (1996).[18] We therefore agree that Baham's enhancement should have been five years, rather than ten, for the armed robbery and AAWA convictions, and thus we remand for resentencing of Baham on those counts.

▮▮▮ The government also concedes that the ADW convictions of both appellants merge with their AAWA convictions because ADW is a lesser included offense of AAWA. *See Gathy,* 754 A.2d at 919. Appellants are also correct that ADW is a lesser included offense of armed robbery when the assault is committed in order to effectuate the robbery. *See Simms v. United States,* 634 A.2d 442, 447 (D.C. 1993); *Owens v. United States,* 497 A.2d 1086, 1096 (D.C.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). The acts which constituted the assault and the robbery were not "detached incidents but a continuing course of . . . conduct," *Glymph,* 490 A.2d at 1160, and at no time, either at trial or on appeal, has the government argued that the assault was the product of a "fresh impulse" which would preclude merger. *See Simms,* 634 A.2d at 447. We hold accordingly that the convictions of ADW merge with both the AAWA and armed robbery convictions, and that on remand the ADW convictions should be vacated. However,

18. Recodified as D.C.Code § 22–4501 (2001).

the AAWA convictions do not merge with the armed robbery convictions and thus should remain undisturbed.

## VI. CONCLUSION

For the foregoing reasons, appellants' convictions are affirmed on the merits. The case is remanded for modification of appellant Baham's sentences for AAWA and armed robbery, and for vacatur of both appellants' redundant ADW convictions, as set forth in part V of this opinion.

*Affirmed on the merits, remanded in part for resentencing.*