*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-CF-0266 & 22-CF-0326

DAVID JEREMIAH MCKINNEY & KEITH BAHAM, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2019-CF3-009555 & 2019-CF3-009976)

(Hon. Michael Ryan, Trial Judge)

(Submitted March 10, 2023                    Decided August 24, 2023)

*Nancy Allen* was on the brief for appellant McKinney.

*Sean R. Day* was on the brief for appellant Baham.

*Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Suzanne Grealy Curt*, *Rachel Forman*, *Kevin Birney*, and *Valerie Tsesarenko*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: David McKinney and Keith Baham were convicted of armed carjacking and several related offenses after robbing Tymon Babin and then stealing his car. The evidence at trial established that Babin was robbed of keys

and other effects when he was 80 to 100 feet away from the car, which was parked around the corner of a building so that he did not see or otherwise notice that it had been stolen until several minutes after the fact. On appeal, McKinney and Baham principally argue that this evidence was insufficient to support a conviction under the District's carjacking statute, which requires that the motor vehicle be in the "immediate actual possession" of the victim at the time of the offense. D.C. Code § 22-2803(a)(1).

We agree that the evidence was insufficient to establish that Babin was in immediate actual possession of his vehicle when it was taken. While our precedents instruct that "immediate actual possession" extends somewhat beyond "literal actual possession," *Sutton v. United States*, 988 A.2d 478, 485 (D.C. 2010), this statutory requirement is not infinitely elastic. The facts of this case push the concept of immediate actual possession past its breaking point. We therefore reverse McKinney's and Baham's convictions for armed carjacking.

McKinney and Baham also argue that the government introduced insufficient evidence to support their convictions for first-degree theft because no evidence established the vehicle's value as over $1,000, the threshold for first-degree theft. D.C. Code §§ 22-3211, -3212(a). We agree, and the government concedes the point,

so we reverse the first-degree theft convictions and remand to the trial court for entry of judgments on the lesser-included offense of second-degree theft. The government likewise concedes that Baham's two convictions for possession of a firearm during a crime of violence (PFCV) merge; we agree and so remand for the trial court to merge those convictions. *See Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999). Finally, McKinney and Baham argue that their convictions for theft and unauthorized use of a vehicle (UUV) merge. As we recently explained, those convictions do not merge, *Austin v. United States*, 292 A.3d 763, 771-72 (D.C. 2023), and we therefore uphold them.

## I. Background

We recount the evidence in the light most favorable to the government, as that is the lens under which we view it when assessing sufficiency of the evidence arguments. *See Wiley v. United States*, 264 A.3d 1204, 1209 (D.C. 2021). One afternoon, Tymon Babin wrapped up his shift at a Virginia barbershop and drove into the District to pick up David McKinney. Babin and McKinney were friends since middle school and had kept in touch over the years. As Babin recounted in his trial testimony, McKinney had reached out earlier that day to invite him to come "hang out and chill." Babin understood the night's plans to involve him, McKinney,

and McKinney's friend Demarco Fox, whom Babin had met on several prior occasions. When he arrived at the address provided by McKinney, they were also joined by a fourth man, Demari Moore, whom Babin did not know well. The men got into Babin's car, and McKinney directed Babin to pick up an additional passenger, Keith Baham, whom Babin also did not know. McKinney next directed Babin to an apartment building in Northeast D.C., where Babin believed the five men were "going to go hang out with some females" whom McKinney knew.

Upon their arrival, Babin parked his car in the apartment building's parking lot, and the five men headed down a sidewalk "around to the side of the building." When they got to the building's entrance, Baham walked up to Babin, pulled out a gun, and told him to "drop everything." Babin testified that McKinney then patted down his pockets and took his wallet, phone, and car keys. Fox unclipped the fanny pack that Babin was wearing across his chest. McKinney directed Babin to unlock the phone, after which he, Baham, Fox, and Moore all walked away. Babin, still afraid of being shot, "ducked off behind some bushes" and did not see in which direction his assailants walked off. When he came out from the bushes several minutes later, he saw that his car was gone. Because of his location in relation to the building's parking lot, Babin did not actually see anybody take his car, and on

cross-examination he agreed that for all he knew in the moment, the car might have been towed.

Babin asked a passerby to call the police. Several officers came to the apartment building in response, two of whom—Sergeant Tristan Hyland and Detective Andrew Gamm—testified at trial. Hyland estimated that Babin had parked his vehicle "approximately 60 feet" from the apartment building, though he was not asked and did not specify the distance between the parking spot and the building's entrance (where Babin was robbed) in particular. Hyland explained that when standing "directly in front of the door" to the apartment building—where the robbery took place—the view to the parking lot was "obscured by a wall." Gamm testified similarly, though he was more specifically asked about the distance from the apartment building's entrance to the relevant parking spot, and he estimated it was "between 80 to about a hundred feet" away, but noted that nobody had actually measured that distance.

Babin went with officers to the police station, where he named McKinney as one of his assailants and offered descriptions of the other three men. McKinney, Baham, Fox, and Moore were all eventually arrested and charged with armed carjacking, D.C. Code § 22-2803(b)(1); armed robbery, *id.* §§ 22-2801, -4502; first-

degree theft (motor vehicle), *id.* §§ 22-3211, -3212(a); and UUV, *id.* § 22-3215. Baham was also charged with two counts of PFCV, *id.* § 22-4504(b).

Before the jury began its deliberations, the trial court provided the standard instruction for armed carjacking, which includes the requirement that the defendants "took a motor vehicle from the immediate actual possession of Mr. Babin against Mr. Babin's will." The jury was further instructed that "immediate actual possession" meant "located close enough that one could reasonably expect Mr. Babin to exercise[] physical control over it and thereby prevent its taking if not deterred by violence or fear." During deliberations, the jury sent a note asking whether "there [is] additional legal guidance/definition beyond what was provided in the instructions for [] the meaning of 'immediate actual possession' regarding the charge of carjacking?" The trial court provided the following response, drawn from the commentary accompanying the model jury instructions:

> With regard to immediate actual possession, the Complaining witness need not be in the car or in direct physical control of the car at the time of the assault. Under the carjacking statute, immediate actual possession is retained if the car is within such range that the Complaining witness could if not deterred by violence or fear retain actual physical control over it.

> In addition, it is not critical to the question of immediate actual possession that the Complaining witness be within close range of the car at the precise time the assault begins.

> The carjacking statute contains no such temporal limitation. A carjacker may take immediate actual possession of a motor vehicle from another by force or violence at any point during a continuous course of assaultive conduct. Not just the starting point.

The first paragraph of that response was not objected to and generally mirrors the court's original instructions, while defense objected to the second paragraph.

The jury convicted McKinney and Baham of all charges, while acquitting Fox and Moore of all counts. The trial court sentenced McKinney and Baham to terms of 7.5 and 15 years, respectively. McKinney and Baham now appeal.

## II. Analysis

### A. Sufficiency of the Evidence To Support Carjacking Convictions

McKinney and Baham most forcefully argue that the government presented insufficient evidence to support their convictions for armed carjacking. In order to secure a conviction for carjacking, the government must prove beyond a reasonable doubt that a defendant: "1) knowingly or recklessly; 2) by force or violence; 3) took from another person; 4) immediate actual possession; 5) of a person's vehicle; or 6) attempted to do so." *Allen v. United States*, 697 A.2d 1, 2 (D.C. 1997) (citing D.C.

Code § 22-2903). McKinney and Baham challenge the sufficiency of the evidence supporting the fourth, "immediate actual possession" element of the offense. They highlight the facts that Babin was 80 to 100 feet from his car both when the robbery began and when his car was taken, and that Babin had no line of sight to the car and apparently did not realize it was gone until several minutes after the fact. We agree that the evidence was insufficient to support their armed carjacking convictions.

This is not our first time interpreting the carjacking statute's requirement that a car be taken from another's "immediate actual possession." While that phrase most clearly includes situations where the complainant is in or within reach of their vehicle, it is well-established that the statute does not require that degree of proximity. *See Winstead v. United States*, 809 A.2d 607, 610 (D.C. 2002). As we explained in *Winstead*, the Council borrowed this language from the District's robbery statute, where it "refers to the area within which the victim can reasonably be expected to exercise some physical control over the property." *Id.* (quoting *Head v. United States*, 451 A.2d 615, 624 (D.C. 1982)). We reasoned that the same concept therefore applies to carjacking, where a victim remains in "immediate actual possession" of their vehicle so long as "the car is within such range that the victim

could, if not deterred by violence or fear, retain actual physical control over it."[1] *Id.* (quoting *United States v. Gilliam*, 167 F.3d 628, 639-40 (D.C. Cir. 1999)).

Like robbery, carjacking is "basically a crime against the person," rather than a mere crime against property covered by theft statutes. *See Snowden v. United States*, 52 A.3d 858, 873 (D.C. 2012) (regarding robbery) (quoting *United States v. Dixon*, 469 F.2d 940, 943 (D.C. Cir. 1972)); *People v. Hill*, 3 P.3d 898, 903 (Cal. 2000) ("[C]arjacking [is] more nearly a crime against the person than a crime against property.").

In this case, testimony established that at the time Babin's car was taken, it was parked about 80 to 100 feet away from him, around the corner of a building that blocked it from his view. McKinney's argument on appeal is essentially that a

---

[1] This formulation raises a question in the carjacking context that does not arise in the typical robbery of objects that can simply be carried away: Are we to ask whether a victim could thwart a thief with keys and immediate access to the vehicle? One might need to be quite close to a vehicle to do that. Or are we instead to take the car as it is, and the thief with whatever tools they bring to the task, and ask whether the complainant was within range to confront the would-be car thief within the time it actually took them to remove the car from the scene? That could clearly take several minutes or more if the thief has no keys, and a person could be many blocks away from their car and still within range to prevent that theft. We have never explored that question, and we need not do so here as McKinney had Babin's keys and ready access to the vehicle, as carjackers tend to have.

person who is so far removed from their vehicle at the time it is taken and unaware that it is even being stolen would more naturally be seen as the victim of a property crime (vehicle theft), rather than a crime against the person (carjacking). For three overarching reasons, we agree and conclude that the evidence was insufficient to establish that the car was under Babin's immediate actual possession, and was therefore insufficient to support the carjacking convictions here.

First, the most natural understanding of what it means to have something in one's immediate and actual possession does not extend to objects this far away and that one has no line of sight to. The statute's use of the words "immediate" and "actual" to modify "possession" indicates that a person must have a more direct proximity to the object than was present here, and Babin's mere possession of the car keys at the time he was robbed is no substitute for such proximity to the car itself, contrary to the government's arguments. *See Sutton*, 988 A.2d at 488 ("[A] victim's physical control over the key does not in itself suggest that the victim was close enough to the car, wherever located, to trigger the carjacking statute."). While we have previously read this statutory phrase somewhat expansively, holding that a victim may be more than an arm's length away from their car and still in immediate actual possession of it, we have in the same breath cautioned against extending that view of a person's immediate actual possession beyond its breaking point. *Id.*

(warning that "[t]oo loosely constru[ing]" the immediate actual possession requirement would render it "meaningless"). To uphold these convictions would do exactly that.

Second, our conclusion aligns with our robbery precedents, which *Winstead* borrowed from when interpreting the meaning of "immediate actual possession." 809 A.2d at 610. This "immediate actual possession" language has been codified in our robbery statute for more than a century, since 1901. *See* District of Columbia Code, 31 Stat. 1189, 1322 (1901). Yet our precedents have never endorsed the view that a complainant 80 to 100 feet (or more) away from an object might be robbed of it, as opposed to being the victim of a theft.[2] *See, e.g.*, *Leak v. United States*, 757 A.2d 739, 743 (D.C. 2000) (bicycle "two feet away" from owner was, "undoubtably, within the victim's immediate actual possession as our cases have applied that term, at least where . . . the owner is aware of the attempted taking"); *Spencer v. United*

---

[2] We once held that the evidence of robbery was sufficient where "the stolen property was located" in the victim's house and the victim "was violently prevented from exercising possession over her property" (she was in fact killed). *Giles v. United States*, 472 A.2d 881, 884 (D.C. 1984). *Giles* sheds no light on how big the house was, and our analysis on this point was limited to a single sentence, so we do not view it as contrary authority. We also caveat the situation where the victim was initially near the object and then forcibly removed from it by threat or violence prior to the object being taken. That is a classic robbery rather than a theft. But Babin was not forcibly removed from his car—he walked away and out of sight from it without threat or violence. The threat and violence came after the fact.

*States*, 116 F.2d 801, 801-02 (D.C. Cir. 1940) (sustaining robbery conviction for taking money from trousers sitting on chair at the foot of the bed that the victim was lying on, "within a very few feet of the victim"); *see also M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

Third, and most importantly, none of our prior carjacking precedents involved this degree of separation between the victim and their vehicle. In the handful of cases where we sustained carjacking convictions over sufficiency challenges where the victim was not physically in or within the car's reach at the incident's inception, the evidence showed: the victim was sitting in a guard booth "a few feet away" from her parked car, *Winstead*, 809 A.2d at 609; the victim was making a call from a payphone "about three feet up from" where his car was idling with its keys in the ignition, *Beaner v. United States*, 845 A.2d 525, 529 (D.C. 2004); and the victim was preparing to enter his house "a mere ten feet away" from his car parked on the street out front, *Clark v. United States*, 147 A.3d 318, 326 (D.C. 2016). We have also cited favorably to a D.C. Circuit opinion affirming a conviction under the District's carjacking statute where the victim had left his car idling and momentarily "stepped out of the vehicle to unlock a parking lot gate." *Winstead*, 809 A.3d at 610 (citing *Gilliam*, 167 F.3d at 639-40). While that opinion does not specify how far the victim was from his car, it stands to reason that a person would park quite close

to a parking lot gate that they left their car idling to open, and the briefing confirms that the victim was about six feet from his car.[3]

The high water mark for what constitutes immediate actual possession, and the only carjacking precedent of ours where the victim was more than ten feet away from their car, came in *Sutton v. United States*, a case in which the complainant was "three car lengths (or roughly forty-five to fifty feet) away from" his car. 988 A.2d at 489. The government's evidence showed that after robbing the victim and taking his car keys, the perpetrators ordered him to lie on the ground and "not to move or he would be shot." *Id.* at 481. When the victim ignored this order, two of the men "said they were going to start shooting at him," and at the same time the victim "heard his own car start up and pull off." *Id.* We concluded that, on this evidence, it was reasonable for the jury to find that "but for the violence against [the victim]," the victim "remained close enough to the vehicle to have 'prevented its taking.'" *Id.* at 489 (quoting *United States v. Kimble*, 178 F.3d 1163, 1168 (11th Cir. 1999)).

---

[3] The government's brief in *Gilliam* specifies that the victim "walk[ed] approximately six feet away" from his car "to unlock the gate," a point that was undisputed in the briefs. Consolidated Brief for Appellee, *United States v. Gilliam*, Nos. 97-3084 & 97-3085, 1998 WL 35239961, at *9 (D.C. Cir. Aug. 3, 1998).

The government argues that *Sutton* compels affirmance here, but we disagree. Two stark differences between this case and *Sutton* counsel in favor of a different outcome. First, Babin was considerably further away from his vehicle than was the complainant in *Sutton*—about twice the distance.[4] Second, Babin could not see or hear his vehicle being taken and was not even aware that it was taken until some minutes later, combatting any suggestion that he might have thwarted the theft had he not been threatened with violence. We pause to elaborate on each point.

On the first point regarding distance, we reiterate that the carjacking statute draws no bright lines. As we explained in *Sutton*, "'immediate actual possession' has an elastic quality, reaching somewhere beyond 'actual possession' at common

---

[4] The government's lone witness who was asked about the distance between the parking spot and where Babin was robbed estimated that distance to be between 80 and 100 feet (compared to 45-50 feet in *Sutton*). Baham argues that the upper end of this range is closer to reality and asks us to take judicial notice of measurements obtained via Google's mapping software that show the distance to be approximately 96 feet, citing to federal cases taking judicial notice of similar distance calculations derived from mapping software. *See, e.g.*, *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017); *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007). Without casting any serious doubt on that estimate's accuracy, the government counters that it would be improper for us to take judicial notice of it. Without commenting on whether it would be proper to do so, we decline to take judicial notice of this estimate as it would not affect our disposition. *See Wilson Sporting Goods Co. v. Hickox*, 59 A.3d 1267, 1270 n.1 (D.C. 2013).

law into the realm of 'constructive possession.'" 988 A.2d at 485 (citations omitted). But as that opinion further noted, the statute's language is not infinitely elastic, and at some point reaches "its snapping point." *Id.* The term "immediate" carries a meaning of "being near at hand" and "not far apart or distant." *See* Immediate, *Webster's Third New International Dictionary* 1129 (2002). The 45 to 50 feet at issue in *Sutton* likely approached the outer bounds of when one might be capable of thwarting a thief who otherwise has access to a car from taking it, see *supra* note 1. Between opening the car door, starting the engine, and putting the car in gear, perhaps a jury could reasonably conclude that a person on foot could close a 45 to 50 foot gap in the time it takes to do those things (as *Sutton* seems to hold). But at some point the distance becomes too great to reasonably draw that conclusion beyond a reasonable doubt. And the 80 to 100 feet we are confronted with in this case takes *Sutton*'s reasoning past its breaking point, where it is no longer reasonable to conclude that the victim has immediate actual possession of their vehicle in the relevant sense.

Seeking to minimize the significance of Babin's distance from his car, the government relies on several federal cases that have affirmed carjacking convictions under what it asserts are "factual circumstances similar to the case at hand." Some of the cases it cites are inapposite. For example, *United States v. Soler* involved the

theft of a vehicle parked just "10 to 15 feet" from the victim—considerably closer than Babin's vehicle in this case. 759 F.3d 226, 228 (2d Cir. 2014). The two cases that at least seem to involve a victim who was similarly far removed from their car are: (1) *Kimble*, where the Eleventh Circuit's opinion does not specify a distance but notes that the victim was working inside of a restaurant with his car "right outside the restaurant" and "alongside the building," 178 F.3d at 1165-66, so perhaps that exceeds the 45-50 feet in *Sutton*, and approaches the 80-100 feet we confront here; and (2) *United States v. Lake*, 150 F.3d 269 (3d Cir. 1998) (Alito, J.), which is the only case that clearly exceeds *Sutton*'s high water mark. Because *Kimble* simply adopted *Lake*'s reasoning, *Kimble*, 178 F.3d at 1167, we will focus on *Lake* to explain why we do not find these cases interpreting the federal carjacking statute to be persuasive when it comes to interpreting the District's materially different carjacking statute.

*Lake* involved a car parked "up [a] steep path to the parking area where [the victim] had parked her car out of sight" before being robbed of her keys, with the robbers then taking her car as she watched and pursued them. *Id.* at 271. While the majority opinion does not specify how far the victim was from her car either when she was robbed of her keys or when her car was taken, the dissenting judge (who would have found the evidence insufficient to support a carjacking) described the

victim as "in city terms, a block away" from her car when the robbery began. *Id.* at 275 (Becker, C.J., dissenting). A city block would seem to be greater than both the 45 to 50 feet in *Sutton* and the 80 to 100 feet at issue here. Nonetheless, *Lake* is not persuasive for purposes of interpreting the "immediate actual possession" requirement in the District's statute, because the federal statute has no such requirement. The federal carjacking statute criminalizes taking a vehicle "from the person or presence of another." 18 U.S.C. § 2119. This language is broader than the "immediate actual possession" requirement found in the District's statute, as it does not suggest the same "immediate" control over the vehicle that our statute requires—merely being in the vehicle's presence is enough. This is why, despite our generic acknowledgement that interpretations of the federal statute "enhance[] our understanding of what" our carjacking statute means, *Sutton*, 988 A.2d at 488, we have expressly disclaimed endorsing the results in cases like *Lake*, *id.* at 488 n.24, and that case is not reconcilable with our statute or our precedents.[5]

---

[5] For the same reason, the government's citation to *People v. Raper*—a case in which Michigan's intermediate appellate court affirmed a carjacking conviction where the victim's car was "at least two hundred yards away," 563 N.W.2d 709, 712-13 (Mich. Ct. App. 1997)—does not affect our view. The statute at issue in that case merely required the victim to be "in lawful possession of the motor vehicle," Mich. Comp. Laws § 750.529a(1). That language seems to be even more capacious than the federal statute's reference to the vehicle being within the victim's "person or presence."

The government counters that once the assailants took Babin's keys and began to walk away, he could have chased after them and reached his car in time for a confrontation had he not been threatened with a gun. Under this theory, as the government puts it, "the distance to Babin's car would not have been a deterrent, as Baham and McKinney would have had to travel the same distance as Babin in order to reach it." That reasoning sweeps far too broadly. Under this view, a person robbed of their car keys in California could be carjacked of their vehicle located in Kolkata (even if it took the robber days to get there), because both the victim and the robber would similarly have to travel halfway around the world to reach the car. That is not a sensible understanding of what it means to have something under one's immediate actual possession; the plain words are not susceptible to meaning possession on par with a person who is similarly distant from an object.[6]

---

[6] To be sure, it also seems like a strained interpretation of what it means to be in the car's "presence," as the federal carjacking statute requires. *But see Lake*, 150 F.3d at 273 (concluding victim was in presence of vehicle because "had [she] not hesitated" due to fear of violence "she could have reached the parking area in time to prevent Lake from taking her car"); *Kimble*, 178 F.3d at 1168 ("Had Wilcher not been in fear for his safety, he could have reached the car and prevented its taking."). It is hard to see how a victim in California could be fairly described as in the presence of their car in Kolkata simply because their robber is similarly distant from it. But that is not the question before us, so we ultimately do not express a view about the proper interpretation of the federal statute.

We also disavowed such a loose construction of the carjacking statute in *Sutton,* warning that it would render the "immediate actual possession" requirement "meaningless, for literally anyone with a car key in the pocket could be said to be 'close enough' to 'exercise physical control' over a vehicle parked blocks away, even at one's home." *Sutton*, 988 A.2d at 488. To avoid that reduction to absurdity, we explained that the proper inquiry is whether the victim was "close enough to exercise control *at the time of the alleged taking of the car,*" and that "no other meaning would make sense."[7] *Id.* When Babin's car was taken, he and his assailants were not equidistant from it. By focusing on Babin's ability to pursue McKinney and Baham when they stole his keys, rather than his ability to exercise control over the car at the time it was taken, the government contravenes this guidance.

The second key difference between this case and *Sutton* is that Babin was not even in a position to perceive that his car was being stolen. Recall that after parking his car, Babin and company walked "around to the side of the building" to the apartment building's entrance, where the robbery took place. As Sergeant Hyland later testified (and the maps introduced into evidence by the government make

---

[7] When the victim is forcibly removed from the car or its immediate vicinity, of course, that marks the beginning of the car's taking. But this case concerns a victim who was far away from his car before any threat or violence occurred.

clear), that location lacked any line of sight to where the car was parked, as it was blocked by the apartment building. Babin testified that he did not actually see or otherwise notice that his car was being taken at the time and, on cross-examination, he agreed that for all he knew in the minutes thereafter, his car might have been towed away.

*Sutton* presented the opposite scenario, where the victim heard his vehicle being taken and remained within eyeshot of it up until the moment it was driven away.[8] The jury in that case heard evidence that the assailants saw the victim try to run and continued to verbally threaten him even as they drove off in his car—some evidence that the assailants themselves thought the victim was in a position to stop them if not dissuaded. *Sutton*, 988 A.2d at 481. That is quite different from this case, where McKinney and company had put the gun away and "walked off"

---

[8] While it is clear that the victim was within eyeshot of his car when he was robbed of his keys and told not to move in *Sutton*, our opinion is not crystal clear whether that remained the case at the time his car was actually taken. *Sutton* mentions the victim "jump[ing] over the fence behind [his] friend's house" between when he was robbed of his car keys and when he heard his car being driven off. 988 A.2d at 483. But there is no description of the fence—such as how high it was or whether it was a chain-link or wrought iron fence that one might readily see through. We did note, however, that the robbers were "in a position" to make good on their threats to "start shooting at" the victim even after he had jumped the fence, indicating that the robbers retained a direct line of sight to the victim, and vice versa. *Id.* The transcripts from that case confirm the point, as the victim described the fence as "not too high, might be 3-feet tall," so that one could readily see over it.

immediately after robbing Babin, and Babin remained unaware of the car theft for some minutes thereafter. The crux of our holding in *Sutton* was that the victim remained in "immediate actual possession" of his vehicle throughout this assault because, but for this threatened violence, he was "close enough to stop the thief." *Id.* at 488. By contrast, it is difficult to imagine how Babin could have stopped the theft of a vehicle that he did not (and, from his position, could not) observe being taken. While he testified that he "ducked off behind some bushes" out of fear that his assailants might come back, he was not within eyeshot of his car even at the outset of the robbery, before any threat or violence, but was instead on the other side of an apartment building intent on walking into it.

McKinney and Baham remain convicted of armed robbery (convictions they do not challenge) and the theft of an automobile. But as we explained in *Sutton*, a carjacking is more than the sum of those two offenses. The statute's legislative history makes clear that the Council viewed carjacking as an "especially traumatic experience [for] the victim, whose zone of privacy is invaded in a way that perhaps is similar only to burglary." *Id.* at 483 (citation omitted). Reflecting this concern, an armed carjacking conviction carries a statutory minimum of 15 years, significantly longer than the 5-year mandatory minimums for first-degree burglary and a first-time armed robbery offense. *Id.* (citing D.C. Code §§22-801(a), -2801,

-4502(a)(1)).[9]  "With such a severe difference at stake . . . 'immediate actual possession,' as applied in a carjacking prosecution, must be addressed with considerable care."  *Id.*  Mindful of this, we conclude that the evidence was insufficient to establish that Babin's car was in his immediate actual possession at the time it was taken from him.  We therefore reverse McKinney's and Baham's convictions for armed carjacking.

## B.  Additional Claims

That brings us to McKinney's and Baham's remaining claims, none of which requires extensive discussion.  First, they argue that the government offered insufficient evidence to support their convictions for first-degree theft, which includes an element that "the value of the property obtained or used is $1,000 or more."  D.C. Code § 22-3212(a).  The government concedes the point, for good reason.  The only evidence about the value of Babin's car came when Babin testified

---

[9] While Baham was sentenced to that 15-year statutory minimum on the armed carjacking charge, McKinney was sentenced to only 7.5 years on that count, owing to the fact that the court sentenced him under the Youth Rehabilitation Act, which permits sentencing below the mandatory minimum.  *See* D.C. Code § 24-903(b)(2) ("Notwithstanding any other law, the court may, in its discretion, issue a sentence [to an eligible youth offender] less than any mandatory-minimum term otherwise required by law.").  McKinney and Baham were 18 and 19 years old at the time of these offenses, respectively.

that he paid "near like $1,000" for it, which is clearly not enough to establish the vehicle's value as being $1,000 or more. We accordingly reverse the first-degree theft convictions and remand for the trial court to enter judgments of conviction on the lesser-included charge of second-degree theft. The government likewise agrees that under our precedents, Baham's two PFCV convictions should merge, so we remand for merger of those convictions as well. *See Nixon*, 730 A.2d at 153.

Finally, McKinney and Baham argue that their convictions for theft and UUV should merge. We disagree. As we recently explained, our case law once directed this result, but we have since abandoned the fact-based approach to merger underlying those decisions, which in any event were abrogated by subsequent legislative enactments. *See Austin*, 292 A.3d at 771-72. As the relevant statute now makes clear, "[a] person may be convicted of any combination of theft, identity theft, fraud, credit card fraud, unauthorized use of a vehicle, commercial piracy, and receiving stolen property for the same act or course of conduct," provided that the resulting sentences for these offenses run concurrently. D.C. Code § 22-3203(a). Because McKinney and Baham were so sentenced, their convictions for theft and UUV do not merge.

### III. Conclusion

For the foregoing reasons, we reverse McKinney's and Baham's convictions for armed carjacking and first-degree theft, remand for the trial court to enter judgments of conviction for second-degree theft and to merge Baham's two convictions for PFCV, and affirm the remainder of their convictions.

*So ordered.*